UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ERIC JAMES COON,<br><br>                    Plaintiff,<br><br>        vs.<br><br>DR. MARY CARPENTER, IN HER<br>INDIVIDUAL CAPACITY,<br><br>                    Defendant. | 4:14-CV-04165-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

This matter is before the court on plaintiff Eric Coon's *pro se* complaint alleging defendant Dr. Mary Carpenter has committed medical malpractice and violated his constitutional rights under the Eighth Amendment to the United States Constitution.  See Docket No. 1.  All of Mr. Coon's claims are based on a July, 2011, injury to his knee and the treatment he received in the aftermath of that injury.  Id.  Mr. Coon is a prisoner in the South Dakota State Penitentiary.

Dr. Carpenter has now moved the court for summary judgment based on the defense of qualified immunity.  See Docket No. 32.  This case has been referred to this magistrate judge for pretrial management pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and the October 16, 2014 standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

Dr. Carpenter filed a separate statement of undisputed material facts as required by local rule.  See Docket No. 34 and D.S.D. LR 56.1A.  Mr. Coon has filed his own statement of facts, but does not respond paragraph by paragraph to Dr. Carpenter's statement as required by local rule.  See Docket No. 40 and D.S.D. LR 56.1B.  The following recitation of facts is drawn from these two documents, with disputes as noted.

Mr. Coon has been an inmate at the South Dakota State Penitentiary since March 29, 1996.  See Docket No. 40, ¶ 1.  Mr. Coon alleges he injured his left knee in early 2011 while he was running.  Id. at ¶ 2.  He asserts he heard a loud "pop" to his left knee at the time.  Id.

Dr. Carpenter was a licensed medical doctor in private practice in Winner, South Dakota, at the time Mr. Coon alleges his initial injury occurred. See Docket No. 34, ¶¶ 1-4.  She became the full-time Medical Director for Corrections Health in September 2012 approximately 18 months after Mr. Coon's initial injury.  Id. at ¶ 5.  She alleges she has been employed by the South Dakota Department of Health for four years as of May 2015, which would place her state employment beginning some time in 2011.  Id. Dr. Carpenter does not elaborate on what her job was with the Department of Health prior to September 2012.  Id.  Since Dr. Carpenter never alleges that her pre-September 2012 actions were *not* taken under color of state law, the court assumes that prior to September 2012, she exercised state authority to

2

determine the course of treatment for Mr. Coon even though she was not yet Medical Director and was engaged in private practice.

Mr. Coon's left knee was x-rayed on February 7, 2011.[1]  See Docket No. 36-2.  That x-ray showed degenerative changes in Mr. Coon's left knee consistent with arthritis.  Id.

Mr. Coon consulted with prison health services on August 26, 2011.  See Docket No. 40-1 at p. 7.  He was complaining his left knee was painful when bent.  Id.  Mr. Coon also described a slight deformity and a lot of crepitus with movement.  Id.  Mr. Coon requested a stronger pain medication.  Id.

On September 6, 2011, Mr. Coon was seen by a prison nurse complaining of dull and sharp pain in his left knee that was worse with overuse.  See Docket No. 36-1.  The nurse noted the pain was not associated with either recent or old trauma to the knee.  Id.  Mr. Coon's left knee was tender to palpation.  Id.  Mr. Coon reported to the nurse that his pain was only slightly better with pain medication and orthotics helped his foot pain, but not his knee pain.  Id.

On September 20, 2011, Ryan Manson, a Certified Nurse Practitioner, saw Mr. Coon for left knee pain.  See Docket No. 36-2.  Mr. Coon told nurse Manson on this occasion that his left knee pain had been ongoing for over a year at that point and that he did not remember any specific injury to his knee.  Id.  Mr. Coon described his knee cracking, popping, and occasionally locking, causing pain that was quite severe and not controlled with the Lodine he had

---

[1] The medical record for this x-ray was not placed into the record by either party, but subsequent medical records make reference to it.

3

been prescribed.  Id.  Mr. Coon said he had been wearing a knee sleeve consistently, but that it did not help his pain.  Id.  Mr. Coon requested a magnetic resonance image (MRI) of his knee.  Id.  Instead, nurse Manson scheduled Mr. Coon for a "therapeutic knee injection" to see if he could get pain relief.  Id.

On September 27, 2011, nurse Manson injected 7 cc of lidocaine and 80 mg of Depo-Medrol into Mr. Coon's left knee.[2]  See Docket No. 36-3.  On November 22, 2011, Mr. Coon saw prison health services again.  See Docket No. 40-1 at p.13.  He described having been running on November 21, 2011 when he heard a popping noise in back of his left knee.  Id.  He described having pain behind his knee that he rated at a 5 on a scale of 1 to 10.  Id.

On November 23, 2011, Mr. Coon's left knee was x-rayed again.  See Docket No. 36-4.  The record indicates Mr. Coon reported a history of injuries to his knee.  Id.  The x-ray showed no evidence of fractures, loose bodies or effusion.  Id.  There was no significant change in the appearance of the knee when compared to the February 7, 2011 x-ray.  Id.

On December 5, 2011, Mr. Coon submitted a kite seeking to know the results of his November 23 x-ray.  See Docket No. 40-1 at p. 15.  He reported he was still having pain behind his left knee even a couple of weeks after it

---

[2] Lidocaine is a numbing agent.  See http://www.drugs.com/search.php?searchterm=lidocaine (last checked October 7, 2015).

Depo-Medrol is an anti-inflammatory corticosteroid injection for use in arthritis and other joint disorders for the control of pain and swelling.  See http://www.drugs.com/pro/depo-medrol.html (last checked October 7, 2015).

"popped."  Id.  Mr. Coon was seen by prison health services the same day as his kite.  Id. at p. 16.  The health services employee observed grinding, popping and evidence of injury to the knee.  Id.

On December 28, 2011, Mr. Coon submitted a kite requesting follow up on his left knee problem.  See Docket No. 40-1 at p. 17.  Mr. Coon was seen by prison health services the same day as his kite.  Id. at p. 18.  He complained of sharp pain in his left knee, tingling and numbness in his toe.  Id.  He exhibited stiffness, soreness, slow movement, and limited range of motion.  Id.

On January 12, 2012, Mr. Coon submitted an informal resolution request, stating his left knee was still hurting and requesting to see a "real doctor."  See Docket No. 40-2 at p. 4.  He stated in the document that he received a shot in his knee a few months back and the relief from the shot did not last long.  Id.

On January 31, 2012, Mr. Coon again saw nurse Manson for his left knee pain.  See Docket No. 35-5.  Mr. Coon reported that the therapeutic injection he received in September "did help quite a bit."  Id.  Mr. Coon reported that he stepped wrong a couple of months prior and heard a loud pop behind his left knee.  Id.  He stated that since the popping incident his pain had been greater.  Id.  Mr. Coon told nurse Manson he had not experienced any swelling in his left knee.  Id.  Examination of Mr. Coon's left knee revealed negative abduction and abduction stress tests.  Id.  He had full range of motion in the knee and no significant swelling or ecchymosis.[3]  Id.  The posterior drawer sign

---

[3] Ecchymosis is a discoloration of the skin resulting from bleeding

5

revealed some slight movement with crepitus.[4]  Id.  McMurray's test was negative.[5]  Id.  Because of the laxity in Mr. Coon's knee and the posterior draw sign with crepitus, nurse Manson recommended an MRI be conducted.  Id.

Dr. Carpenter denied the nurse's request for an MRI on February 8-9, 2012, and instead recommended another therapeutic injection of Mr. Coon's knee.  See Docket No. 36-6.  On March 27, 2012, another therapeutic injection of Mr. Coon's knee was undertaken, using again 7 cc lidocaine and 80 mg Depo-Medrol.  See Docket No. 36-7.  On this occasion, he told nurse Manson that his left knee occasionally "gives out" while he is walking.  Id.

Mr. Coon again saw nurse Manson on April 26, 2012.  See Docket No. 36-8.  On this occasion, Mr. Coon reported that he still had some pain behind his left knee, but that his joint pain had decreased after the Depo-Medrol injection.  Id.  Mr. Coon said his left calf and left hip had begun to hurt due to compensating for his knee.  Id.  Nurse Manson ordered an Ace bandage wrap and some hip exercises 2-3 times per day.  Id.

Mr. Coon next submitted a kite requesting to see prison health services for his left knee on November 5, 2012.  See Docket No. 40-2 at p. 13.  He stated

---

underneath.  See http://medical-dictionary.thefreedictionary.com/ecchymoses (last checked October 7, 2015).

[4] The posterior drawer test tests the integrity of the posterior cruciate ligament of the knee.  See http://www.physio-pedia.com/Posterior_Drawer_Test_(Knee) (last checked October 7, 2015).

[5] McMurray's test is a rotation test for determining if there is torn cartilage in the knee.  See http://www.physio-pedia.com/McMurrays_Test (last checked October 7, 2015).

his knee popped again over two weeks prior, his knee had been swollen almost the whole time, and he wanted to see a doctor.  Id.  Mr. Coon was seen by health services the same day.  Id. at p. 14.  The nursing assessment records that Mr. Coon described a sharp pain in his left knee, made worse by movement, standing up, and walking.  Id.  The pain was described as "severe." Id.  The nurse's examination revealed swelling and tenderness in the knee.  Id. The nurse indicated Mr. Coon should be reevaluated for an MRI.  Id.

Mr. Coon saw nurse Manson again on November 20, 2012.  See Docket No. 36-9.  He reported increasing pain in his left knee, specifically with climbing stairs and squatting.  Id.  Mr. Coon reported that the therapeutic injections he received did not help significantly.  Id.  On this occasion, there were no abnormal signs as to Mr. Coon's knee:  no swelling, redness, ecchymosis, joint effusion, crepitus, or laxity.  Id.  In addition, Mr. Coon had full range of motion and walked with a normal gait.  Id.  McMurray's test was negative.  Id.  Nurse Manson requested that Mr. Coon have a physical therapy visit.  Id.  Dr. Carpenter approved this request.  See Docket No. 36-6.

Mr. Coon saw nurse Manson on March 26, 2013, for a number of health concerns.  See Docket No. 35-11.  He did not complain about his left knee at all during this visit.  Id.  He again saw nurse Manson on May 14, 2013, and again had no complaints about his left knee.  See Docket No. 35-11.  The nurse noted on this visit that Mr. Coon walked without difficulty and with a normal gait and that, although he was prescribed 400 mg of Lodine as needed for knee pain, Mr. Coon reported that he took the Lodine only once or twice a week.  Id.

7

On June 20, 2013, Mr. Coon again saw the nurse, reporting on this occasion that he was having some continued left knee pain.  See Docket No. 35-13.  Mr. Coon indicated he was given physical therapy exercises to do, but that he lacked a theraband to do the exercises with.  Id.  Nurse Manson gave Mr. Coon a green theraband with which to do his physical therapy.  Id.

On July 23, 2013, Mr. Coon saw the nurse again.  See Docket No. 35-14. He did not mention his left knee, other than to request a black theraband instead of the green one he had previously been given.  Id.

The next nurse record for Mr. Coon is dated November 5, 2013.  See Docket No. 35-15.  On this occasion, Mr. Coon complained of left knee pain. Id.  Mr. Coon's complaints this time included mild swelling.  Id.  Although Mr. Coon walked without difficulty using a normal gait and all tests and examinations were normal except some slight laxity in the knee, nurse Manson again made a recommendation for an MRI of Mr. Coon's left knee.  Id. Dr. Carpenter denied the request for an MRI as "non-emergent."  See Docket Nos. 36-6, 36-16.

Two months later, Mr. Coon again saw nurse Manson on January 2, 2014.  See Docket No. 35-17.  This time, he reported left knee pain that was sharp and radiated from his knee to his left heel.  Id.  In addition, he reported his knee occasionally "locked."  Id.  Nurse Manson set forth Mr. Coon's history of significant chronic left knee pain.  Id.  The nurse noted that Mr. Coon had been doing physical therapy exercises for over a year, with no pain relief.  Id. Furthermore, nurse Manson noted that Mr. Coon had been given multiple

8

therapeutic injections and multiple NSAIDs, including Lodine, Clinoril, and Mobic, none of which alleviated Mr. Coon's pain.  Id.

On December 9, 2013, Mr. Coon saw prison health services again.  See Docket No. 40-3 at p. 7.  He described continuing sharp, throbbing pain in his knee front and back which is not alleviated by anything.  Id.

On February 5, 2014, Mr. Coon saw E.R. Regier, M.D.  See Docket No. 35-18.  Mr. Coon reported daily symptoms with his knee including swelling, instability even when sitting, and possible dislocations.  Id.  Dr. Regier noted that Mr. Coon was walking with a slight limp and that his knee was unstable when he got down off the exam table.  Id.  Dr. Regier's exam showed some widening and enlargement of Mr. Coon's left knee joint and prominence and mild protuberance on the rear of the knee.  Id.  The knee was tender both medially and laterally along with instability of the medial and lateral collateral ligaments.  Id.  There was slightly positive anterior drawer sign and positive Lachman sign.[6]  Id.  Mr. Coon expressed considerable pain with Dr. Regier's passive movement of Coon's knee.  Id.  Dr. Regier agreed that an MRI of Mr. Coon's left knee was appropriate.  Id.  This time, Dr. Carpenter approved the request.  See Docket No. 35-19.

The MRI was conducted on February 21, 2014.  See Docket No. 35-20. The MRI revealed a complex tear in the lateral meniscus body with significant volume loss, a marginal osteophyte formation, a cyst formation near the

---

[6] Lachman's test is a passive accessory movement test of the knee to identify instability in the single and sagittal plane consistent with problems with the anterior cruciate ligament (ACL).  See http://www.physio-pedia.com/Lachman_Test (last checked October 7, 2015).

insertion of the posterior root, and cartilage thinning.  Id.  In addition, the MRI revealed a complete avulsion of the posterior root of the medial meniscus, marginal osteophyte formation, and a defect in the condylar cartilage.  Id. There was also a moderate-sized Baker's cyst measuring 10 centimeters.[7]  Id.

Despite this evidence of significant, objective damage to the mechanical components of Mr. Coon's knee, on April 4, 2014, Dr. Carpenter denied Dr. Regier's request to send Mr. Coon to an orthopedic specialist for a consultation.  See Docket No. 35-21.  Instead, she recommended further physical therapy "to see if strengthening improves symptoms."  Id.

Dr. Regier accordingly submitted a request for Mr. Coon to attend physical therapy at Avera Physical Medical Rehabilitation.  See Docket No. 35-22.  Dr. Carpenter approved this request.  Id.  Between April 17 and May 7, 2014, Mr. Coon attended six physical therapy sessions at Avera.  Id.  In physical therapy records dated April 22 and 24, 2014, the therapist recommended that Mr. Coon consult with an orthopedic surgeon.  See Docket No. 40-4 at pp. 26-27.

On May 7, 2014, Mr. Coon returned for a medical visit with Dr. Regier. See Docket No. 35-24.  Mr. Coon reported his left knee symptoms were increasing and he complained of instability, frequent swelling, and his knee giving out and locking.  Id.  He reported his pain to be constant and that it interfered with his sleep.  Id.  Dr. Regier reported that the Avera physical

_____

[7] A Bakers cyst is a fluid-filled cyst that causes a bulge and a feeling of tightness behind your knee and is usually indicative of a problem with the knee joint.  See http://www.physio-pedia.com/Baker's_Cyst (last checked October 7, 2015).

therapist who treated Mr. Coon did not see significant benefit from therapy for Mr. Coon and advised that Mr. Coon consult an orthopedic specialist.  Id.

Dr. Regier again submitted a utilization management request (UM) seeking an orthopedic consult for Mr. Coon's knee with Dr. Peterson at Core Orthopedics at Avera Medical.  See Docket No. 35-25.  This time, Dr. Carpenter approved the request on May 8, 2014.  Id.  Dr. Erick Peterson, an orthopedist, saw Mr. Coon on May 20, 2014.  See Docket No. 35-26.  He examined Mr. Coon and reviewed his x-rays and MRI.  Id.  Dr. Peterson discussed both surgical and nonsurgical options for treating Mr. Coon's left knee and recommended that Mr. Coon undergo arthroscopic surgery for partial medial and lateral meniscectomy and debridement.  Id.  Dr. Peterson stated that he could not make Mr. Coon's knee completely better, but he could improve his symptoms. Id.

Dr. Regier then submitted a request on June 5, 2014, for Mr. Coon to undergo surgery on his left knee.  See Docket No. 35-27.  Dr. Carpenter approved the request the same day.  Id.  On June 19, 2014, Mr. Coon saw nurse Manson for pre-operative work-up.  See Docket No. 40-4 at p. 39. Mr. Coon underwent surgery on July 11, 2014.  See Docket No. 35-28. Mr. Coon saw Dr. Peterson four times in follow-up after the surgery between July 19, 2014 and January 6, 2015.  See Docket Nos. 35-29, 35-30, 35-31, and 35-32.

In addition, Mr. Coon attended outpatient physical therapy with Avera Physical Medical Rehabilitation 2-3 times per week for 12 weeks following his

11

surgery.  See Docket No. 35-33.  Only one of these physical therapy records was supplied:  it is his initial post-surgery evaluation.  See Docket No. 35-38. In that record, Mr. Coon advised the therapist that he was initially placing weight through his left lower extremity, but then realized he was not supposed to be doing that and stopped.  Id.  At the time of the visit, Mr. Coon was using crutches to walk.  Id.

On November 5, 2014, Mr. Coon filed the instant lawsuit against Dr. Carpenter.  See Docket No. 1.  On December 18, 2014, Mr. Coon again saw nurse Manson complaining that he thought his knee was regressing.  See Docket No. 40-4 at p. 72.  Nurse Manson noted that Mr. Coon exhibited tenderness and pain with a noticeable positive anterior drawer sign.  Id.

Mr. Coon was seen by Dr. Peterson at Avera on January 14, 2015.  See Docket No. 40-5 at p. 11.  At that visit, Mr. Coon's left knee exhibited positive McMurray's test and crepitus along with mild medial joint line tenderness.  Id.

Dr. Carpenter approved a second MRI of Mr. Coon's left knee which occurred on February 18, 2015.  See Docket Nos. 35-35 and 35-37.  A left knee ACL cage brace was approved by Dr. Carpenter post-surgery as well.  See Docket No. 35-36.

Dr. Peterson dictated the following after his review of the second MRI of Mr. Coon's left knee post-surgery:

> This [second MRI] shows severely torn extruded bodies of the lateral and medial meniscus with posterior root tears of both. Unfortunately, the degenerative changes appear to be advancing. He is not a candidate for any sort of arthroscopic treatment at this point in time.  It does not appear that he healed his meniscus repair.  He just had too much degenerative change to begin with

12

> and I am uncertain about his level of compliance postoperatively.  I do not recommend any sort of surgical treatment right now.  He will need medical treatment for osteoarthritis.  I anticipate in the five to ten year mark he will probably require total knee replacement.

See Docket No. 35-37.

On March 19, 2015, Mr. Coon saw Dr. Regier again regarding his left knee.  See Docket No. 35-39.  At that time, he reported some "buckling" of his knee, for which he said Dr. Peterson had recommended a cage brace.  Id.  Dr. Regier noted that Mr. Coon had just been fitted for such a brace.  Id.  Mr. Coon reported that he felt his knee had improved to some extent, his pain was less severe and he was having fewer swelling episodes.  Id.  He told Dr. Regier that he had been able to run and play handball on one or two occasions without difficulty.  Id.  Dr. Regier recommended to Mr. Coon that he avoid playing any handball and that he avoid aggressive or prolonged running.  Id.

In his complaint, Mr. Coon alleges that Dr. Carpenter's refusal to permit an MRI sooner in the treatment of his left knee damaged his knee further and caused him unnecessary pain.  He repeats these assertions in his affidavit in resistance to Dr. Carpenter's motion, including an allegation that Dr. Carpenter's delay in treatment has necessitated a total knee replacement in his future.  See Docket No. 40-9 at p. 4.  He alleges Dr. Carpenter's conduct constituted deliberate indifference to his serious medical needs in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

13

Dr. Carpenter now moves for summary judgment in her favor, arguing that she is entitled to qualified immunity for Mr. Coon's claim. She argues that Mr. Coon has not made out a constitutional violation. If he has, then Dr. Carpenter argues in the alternative that the constitutional violation was not clearly established.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE & PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  Though *pro se* litigants like Mr. Coon are entitled to a liberal construction of their pleadings, Fed. R. Civ. P. 56 remains equally

applicable to them.  Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).

**B.     The Law of Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Coon must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 536 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances

16

of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, ___ U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, ___ U.S. ___, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 134 S. Ct. at 5.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818).  Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Id.  Even then, the Court has pointed out that Fed. R. Civ. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id.  Such discretion includes the ability to establish limits on the number of depositions and

interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.

## C.    Deliberate Indifference to a Serious Medical Need

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015).  That prohibition includes prison officials' deliberate indifference to the medical needs of inmates.  Id.  That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Id. at 104-05.

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.  Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

18

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Coon is required to show (1) that he suffered objectively serious medical needs and (2) that defendant actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784. To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" Allard, 779 F.3d at 771-72.

"[A] total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.'" Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990)). A plaintiff can also show deliberate indifference by demonstrating that a defendant denied access to or intentionally delayed medical care. Allard, 779 F.3d at 772.

Mr. Coon essentially claims that Dr. Carpenter should have approved an MRI of his left knee sooner and should have authorized surgery sooner. He alleges that, had she done so, two results would have materialized: (1) he would have been relieved of pain and suffering sooner and (2) his knee would have been capable of being surgically repaired. Dr. Carpenter opposes both of these assertions; she also argues that Mr. Coon has not shown that he had a serious medical need. The court addresses each of these contentions separately.

### 1.    Serious Medical Need

Citing a string of cases from federal district courts in New York, Dr. Carpenter asserts that the condition of Mr. Coon's knee did not constitute a serious medical need. Cases closer to home establish the contrary.

"A medical condition does not need to be an emergency in order to be considered serious under Estelle." Oldham v. Chandler-Halford, 877 F. Supp. 1340, 1354 (N.D. Iowa 1995) (citing Ellis v. Butler, 890 F.2d 1001, 1003 n.1 (8th Cir. 1989)). The Eighth Circuit has defined a serious medical need as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Id. (quoting Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1992). If the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain," it is a serious medical need. Helling v. McKinney, 509 U.S. 25, 32-33 (1993).

20

In <u>Fleming v. Nebraska Dept. of Correctional Servs.</u>, 2006 WL 2990355 (D. Neb. 2006), the district court found that the plaintiff's knee condition constituted a serious medical condition where the plaintiff had torn cartilage in his knee and a Baker's cyst for which a physician had recommended surgery. <u>Id.</u> at *9-10, *14.  Likewise, in <u>Cain v. Luria</u>, 2007 WL 781812 (E.D. Mo. 2007), the district court held that summary judgment was inappropriate where the plaintiff's doctor recommended she receive a total knee replacement surgery. The plaintiff's knee, which included pain and catching in the joint, was a serious medical need.  <u>Id.</u> at *1-3.

In <u>Cain</u>, the defendant, the director of medical services for the corrections department, argued that plaintiff had failed to demonstrate a serious medical need because (1) she did not place sufficient medical evidence in the record to show the damaging effect of the delay in treatment and (2) the plaintiff had seen prison health care workers at various times and did not on those occasions complain of knee pain.  <u>Id.</u> at *3.  These arguments are mirrored by Dr. Carpenter in this case.  The <u>Cain</u> court rejected the arguments on summary judgment because the medical records in the case demonstrated an objectively serious medical need and that medical doctors had recommended the knee replacement surgery.  <u>Id.</u>  See also <u>Dowty v. Waukazoo</u>, 2012 WL 4903664 (D.S.D. Oct. 16, 2012) (holding that shoulder condition represented a serious medical need where physician recommended arthroscopic surgery to treat the shoulder).

21

Here, if one takes the longitudinal view of Mr. Coon's medical records, he consistently complained of pain in his left knee from 2011 through 2014. However, there are isolated visits with prison medical staff where Mr. Coon did not complain of knee pain. His knee symptoms included sharp pain as early as September 6, 2011. See Docket No. 36-1. The knee began to lock as early as September 20, 2011. See Docket No. 36-2. Pain medication, knee sleeves, and therapeutic injections failed to provide Mr. Coon lasting pain relief nor did these interventions stabilize his knee so that he could walk without the knee locking, catching or buckling.

On three occasions a nurse recommended that Mr. Coon receive an MRI in 2012 and 2013. See Docket No. 35-3 (dated January 31, 2012); Docket No. 40-2 at p. 13 (dated November 5, 2012); and Docket No. 35-15 (dated November 5, 2013). These recommendations were reiterated by a medical doctor on February 5, 2014. See Docket No. 35-19. These recommendations by medical professionals, together with the whole of Mr. Coon's medical records including the results of the MRI once it was performed, convince this court that Mr. Coon's left knee presented a serious medical condition.

### 2.    Pain and Suffering

Both defendant's and Mr. Coon's evidence show that his pain and discomfort were much improved after the surgery on his knee, even though his knee was not repaired completely. See Docket No. 35-39. The question then becomes whether the evidence in the record is sufficient to create a genuine

issue of material fact on Mr. Coon's deliberate indifference claim concerning alleviation of his pain and suffering.

Here, <u>Allard</u> is instructive.  In that case, Allard complained repeatedly of pain in his abdomen and failure to have bowel movements for extended periods of time, beginning on February 11.  <u>Allard</u>, 779 F.3d at 769-70.  Defendants ran several tests and responded to Allard's complaints with various treatments and diagnostic procedures (including an x-ray), none of which had any lasting effect on Allard's symptoms.  <u>Id.</u>  He was taken to a hospital emergency room on February 17 because he was unable to walk and could not take any more laxatives due to vomiting.  <u>Id.</u>  The emergency room physicians took x-rays, which did not reveal any obstruction.  <u>Id.</u> at 770.  No CT scan was conducted, but the hospital radiologist recommended one be conducted if Allard's symptoms persisted.  <u>Id.</u>  Allard disagreed with the medical directives given him, but prison officials did not change those directives.  <u>Id.</u>

On February 20, Allard suffered a perforated diverticulum and was given emergency surgery including installation of a colostomy bag and repair of his bowel.  <u>Id.</u> at 771.  Allard brought suit, alleging defendants violated his constitutional right to medical care under the Eighth Amendment by failing to diagnose and treat his obstructed bowel.  <u>Id.</u> at 772.  The Eighth Circuit held Allard failed to demonstrate deliberate indifference, noting that prison officials twice brought Allard to the emergency room and twice outside independent medical personnel diagnosed mere constipation.  <u>Id.</u>  Allard's expert had opined that a physician made aware of Allard's symptoms and viewing the x-rays of

23

Allard's abdomen would have diagnosed Allard's bowel obstruction.  Id.  The Eighth Circuit held this evidence may support a finding of negligence on the part of defendants, but it did not establish deliberate indifference.  Id.

Allard also argued his care was deliberately indifferent.  Id.  Where some medical care is provided, a § 1983 plaintiff may prove his case by establishing the treatment provided, "or lack thereof, so deviated from professional standards that it amounted to deliberate indifference."  Id.  The Eighth Circuit denied this claim as well.

The court noted that defendants did not ignore Allard's complaints or his condition, but continued to try different treatments to address his symptoms.  Id.  Allard, in fact, reported relief as a result of these treatments at least temporarily.  Id.  Although Allard told defendants he disagreed with their course of treatment, the court stated that "a healthcare provider need not accept as true medical judgments offered by their patients but must make treatment decisions on the basis of many factors, only one of which is patient's input."  Id. at 772-73.  Because the treatments defendants gave Allard were "not so ineffective as to be criminally reckless," they did not "rise to the level of deliberate indifference."  Id. at 773.

Dr. Carpenter is entitled to qualified immunity up to and including Mr. Coon's first MRI.  This covers the period from February 7, 2011, up through February 21, 2014.  During this period, Mr. Coon complained of pain in his left knee, going from tolerable early on to pain later that kept him up at night.  He described increasingly serious symptoms including his knee swelling, giving

out and locking.  Prison medical staff responded by prescribing prescription pain medication, physical therapy, two therapeutic injections, and orthopedic sleeves for Mr. Coon's knee.  That none of these were the MRI Mr. Coon thought he should have, or that prison medical staff also eventually thought he should have, does not prove that Dr. Carpenter was deliberately indifferent. Furthermore, Mr. Coon reported at least some improvement of his pain, even if only temporarily, following each of these medical interventions.  Dr. Carpenter's conduct before the first MRI was not deliberately indifferent.

However, after the first MRI was performed on February 21, 2014, significant, mechanical, objectively-verifiable damage was clearly present in Mr. Coon's knee.  The MRI revealed a complex tear in the lateral meniscus body with significant volume loss, a marginal osteophyte formation, a cyst formation near the insertion of the posterior root, and cartilage thinning.  See Docket No. 35-20.  In addition, the MRI revealed a complete avulsion of the posterior root of the medial meniscus, marginal osteophyte formation, and a defect in the condylar cartilage.  Id.  There was also a moderate-sized Baker's cyst measuring 10 centimeters.  Id.

Even a layperson "would easily recognize the necessity for a doctor's attention" given this description of Mr. Coon's left knee.  Coleman, 114 F.3d at 784.  However, even though Dr. Regier requested that Mr. Coon see an orthopedic specialist following the MRI, Dr. Carpenter refused that request and directed that Mr. Coon continue to perform physical therapy.  Of course, by this point, Mr. Coon had assiduously performed physical therapy for a year

with no reduction in his symptoms—a fact that was documented in his medical records. It was simply ridiculous for Dr. Carpenter to believe that, after a year of doing physical therapy with no results, continued physical therapy would suddenly yield results. Furthermore, no reasonable lay person would believe that continued physical therapy would fix the problems with Mr. Coon's left knee that were revealed by the MRI. At this point, Dr. Carpenter's refusal to allow Mr. Coon to see an orthopedic specialist did amount to deliberate indifference.

Dr. Carpenter did, however, eventually relent and allow Mr. Coon to see an orthopedic specialist on May 8, 2014 (after the physical therapists twice told prison officials that physical therapy would be of no avail to Mr. Coon). See Docket No. 35-25. Thus, Mr. Coon's claim against Dr. Carpenter for pain and suffering induced by Dr. Carpenter's delay of treatment is cognizable for the period from February 21, 2014, until May 8, 2014. The court recommends denial of Dr. Carpenter's motion for summary judgment on Mr. Coon's claim for this limited window and for these limited damages.

### 3.    Repairability of the Knee

Mr. Coon submits his own affidavit in support of his assertion that, had an MRI been conducted sooner, he would have received surgery sooner, and that his knee would have been capable of being completely repaired surgically at this earlier point. Mr. Coon submits no medical testimony to this effect to support his position.

26

The only medical evidence Mr. Coon points to, aside from his own affidavit, is the statement in Dr. Peterson's review of the post-surgery MRI of Mr. Coon's left knee.  In reviewing that second MRI, Dr. Peterson wrote "unfortunately, the degenerative changes appear to be advancing.  He is not a candidate for any sort of [further] arthroscopic treatment at this point in time. It does not appear that he healed his meniscus repair.  *He just had too much degenerative change to begin with . . .*"  See Docket No. 35-37 (emphasis added).

This statement by Dr. Peterson is insufficient to show the causation Mr. Coon advances.  Dr. Peterson did not give an opinion as to what the level of degenerative changes were in Mr. Coon's left knee at the time Mr. Coon first began to complain of pain and request that an MRI be conducted.  We know from the February 7, 2011 x-ray that there *were* in fact degenerative changes in the knee from the first images we have in the record concerning the knee. Timing here is key.  In order to succeed, Mr. Coon would have to establish that when he first obtained his MRI (February 21, 2014), the level of degenerative changes in his knee were such that a complete repair could have been accomplished through orthopedic surgery at that point.  Dr. Peterson's records do not establish the proposition of complete surgical repairability at any of these times and no other piece of evidence establishes this either.

The court concludes that Mr. Coon has failed to show that Dr. Carpenter's delay resulted in a knee that could no longer be surgically

27

repaired.  However, the court does not recommend summary judgment on this claim at this point.

The Federal Rules of Evidence and Civil Procedure grant the court discretion to appoint an expert as the court's own expert.  See U.S. Marshals Service v. Means, 741 F.2d 1053 at 1057 (8th Cir. 1984) (citing FED. R. EVID. 614(a) and 706(b) and FED. R. CIV. P. 54(d)).  The court has "strongly emphasize[d] that this discretionary power is to be exercised only under compelling circumstances."  Id.  The court's discretionary decision to deny a *pro se* plaintiff the appointment of a medical expert in an Eighth Amendment deliberate indifference and medical malpractice claims has been repeatedly affirmed.  See Toney v. Hakala, 556 Fed. Appx. 570, 571 (8th Cir. 2014); Robinson v. Reed, 977 F.2d 586, *1 (8th Cir. 1992); Bradshaw v. Lappin, 484 Fed. Appx. 217, 223 (10th Cir. 2012); Hannah v. United States, 523 F.3d 597, 600-01 (5th Cir. 2008); Ledford v. Sullivan, 105 F.3d 354, 360-61 (7th Cir. 1997).  The burden is on Mr. Coon to show the compelling need justifying the appointment of an expert in his case.  Jones v. Liong, 986 F.2d 503, *1 (8th Cir. 1993) (citing United States v. Sailer, 552 F.2d 213, 215 (8th Cir. 1977)).

Previously, Mr. Coon moved for the appointment of a medical expert and this court denied that motion, holding that Mr. Coon had not demonstrated a compelling need for an expert.  See Docket Nos. 25 and 31.  That was before Mr. Coon had received copies of his medical records and before this court had reviewed such records.  Should the district court agree with this magistrate judge's recommendation that Mr. Coon's claim for pain and suffering for the

28

delay of surgery from February 21, 2014 until May 8, 2014 survives summary judgment, this court recommends that an expert be appointed to assist the court in determining whether delay of the MRI or of the surgery affected the outcome of Mr. Coon's arthroscopic surgery.

**D.     Qualified Immunity--Clearly Established**

Dr. Carpenter also seeks summary judgment on qualified immunity grounds by arguing that Mr. Coon's right to surgical treatment of his left knee was not a constitutional right that was clearly established at the time Dr. Carpenter denied Dr. Regier's request on Mr. Coon's behalf to consult with an orthopedic specialist.

> A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  In determining whether a right was clearly established, we must define the right allegedly violated "at the appropriate level of specificity before [we] can determine whether it was clearly established."  "The Supreme Court, however, has made it clear that there need not be a case with materially or fundamentally similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution."  A right is clearly established if the law, as established at the time of the events in question, gave the officials "fair warning that the alleged conduct was unconstitutional."

Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008) (citations omitted).  For a case to be considered as posing a right that was "clearly established," the law does not require that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Al-Kidd, 563 U.S. ___, 131 S. Ct. at 2083.

A prisoner's right to medical treatment for serious medical needs has been well-established in the law since at least the time the Estelle decision was

rendered in 1976.  That includes the need for orthopedic consultation and surgery where certain serious conditions are present that will not heal on their own and which seriously affect a prisoner's ambulation.  Langford v. Norris, 614 F.3d 445, 461-62 (8th Cir. 2010); Dowty v. Waukazoo, 2012 WL 4903664 (D.S.D. 2012); Cain v. Luria, 2007 WL 781812 (E.D. Mo. 2007); Fleming v. Nebraska Dept. of Correctional Servs., 2006 WL 2990355 (D. Neb. 2006).  Here, the court has given Dr. Carpenter the benefit of the doubt for all medical decisions made up to and including the first MRI on February 21, 2014. However, upon receiving the results of that MRI, no lay person, let alone a medical doctor like Dr. Carpenter, could deny the need for orthopedic care for Mr. Coon's knee.

Dr. Carpenter offers two explanations as to why she denied the consultation with the orthopedic doctor after receiving the results of the MRI. First, she states that she believed physical therapy may have improved Mr. Coon's symptoms.  See Docket No. 33 at p. 10.  She also posits that the surgeon would want the muscles around Mr. Coon's knee to be as strong as possible before surgery.  Id.  However, the medical records created by prison medical staff documented that Mr. Coon had already been doing physical therapy exercises that had been prescribed for him after an outside consultation with a physical therapist and that these exercises had been done for over one year.  There is no suggestion in the medical records that Mr. Coon was anything less than completely compliant with the exercises as prescribed. Thus, any improvement in symptoms and any strengthening to be realized from

30

doing physical therapy would have already occurred.  The court concludes that there is a genuine issue of material fact as to whether Dr. Carpenter was plainly incompetent or knowingly violated the law by denying Mr. Coon a consultation with an orthopedic doctor.  McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009).  Accordingly, the court rejects Dr. Carpenter's suggestion that she be granted qualified immunity because the law was not clearly established.

## CONCLUSION

This magistrate judge recommends that defendant Mary Carpenter's motion for summary judgment be granted in part and denied in part as described above.  The court recommends that plaintiff Eric Coon's claim for pain and suffering due to delay in medical treatment between February 21, 2014 and May 8, 2014 be allowed to go forward and that discovery for this claim be allowed.  The court further recommends that the district court consider appointing an expert for the court to render an opinion whether the delay in authorizing surgery affected the outcome of Mr. Coon's arthroscopic surgery.  It is further recommended that the district court consider granting Mr. Coon's pending motion for appointment of counsel (Doc. 45).

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

31

Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

      DATED October 7, 2015.

            BY THE COURT:

            VERONICA L. DUFFY
            United States Magistrate Judge